UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
:
UNITED STATES OF AMERICA        :        S9 19 Cr. 536 (PKC)
:
     -v.-                       :        Terminated as moot.
                                :        SO ORDERED.
ABEL MONTILLA,                  :        Dated: 2/15/2023
     a/k/a "Coche Bomba,"       :
                                :        *P. Kevin Castel signature*
             Defendant.         :        P. Kevin Castel
                                :        United States District Judge
------------------------------------------------------------x


# THE GOVERNMENT'S MOTIONS *IN LIMINE*


                                         DAMIAN WILLIAMS
                                         United States Attorney
                                         Southern District of New York


Juliana N. Murray
Ryan B. Finkel
Assistant United States Attorneys
     *Of Counsel*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ............................................................................................................................ 1

    A.    The Robbery .................................................................................................... 1

    B.    The Investigation ............................................................................................ 2

    C.    The Charges .................................................................................................... 3

ARGUMENT .................................................................................................................................. 5

    I. The Court Should Admit Montilla's Own Statements and Co-Conspirator Statements ......... 5

        A. Applicable Law ....................................................................................................... 5

        B. Discussion ................................................................................................................ 7

    II. Evidence Concerning Montilla's Prior Narcotics Conviction Should Be Admitted If He Testifies ....................................................................................................................................... 9

        A.    Applicable Law ............................................................................................... 9

        B.    Discussion ..................................................................................................... 11

    III. The Court Should Impose Reasonable Limits on Cross-Examination of CW-1 ................ 12

        A.    Applicable Law ............................................................................................. 12

        B.    Discussion ..................................................................................................... 13

    IV. Evidence or Argument Concerning the Consequences the Defendant Faces if Convicted Should be Precluded .................................................................................................................. 14

CONCLUSION ............................................................................................................................. 15

## **TABLE OF AUTHORITIES**

*Bourjaily v. United States*, 483 U.S. 171 (1987) .................................................................. 6

*Brown v. United States*, 356 U.S. 148 (1958) ..................................................................... 9

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) .................................................................. 13

*Shannon v. United States*, 512 U.S. 573 (1994) ................................................................. 14

*United States v. Beverly*, 5 F.3d 633 (2d Cir. 1993) ........................................................... 10

*United States v. DiLapi*, 651 F.2d 140 (2d Cir. 1981) ......................................................... 9

*United States v. Dupre*, 462 F.3d 137 (2d Cir. ) ................................................................. 7

*United States v. Estrada*, 430 F.3d 606, 617 (2d Cir. 2005) ......................................... 10, 11

*United States v. Ferguson*, 758 F.2d 843 (2d Cir. 1985) ..................................................... 9

*United States v. Gambino*, 951 F.2d 498 (2d Cir. 1991) ................................................... 10

*United States v. Garcia*, 936 F.2d 648 (2d Cir. 1991) ....................................................... 10

*United States v. Harvey*, 991 F.2d 981 (2d Cir. 1993) ...................................................... 12

*United States v. Havens*, 446 U.S. 620 (1980) .................................................................... 9

*United States v. Hayes,* 553 F.2d 824 (2d Cir. 1977) ................................................... 10, 11

*United States v. Huddleston*, 485 U.S. 681, 685 (1988) ...................................................... 9

*United States v. Keats*, 937 F.2d 58 (2d Cir. 1991) ............................................................. 6

*United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990) ................................... 13

*United States v. Marin*, 669 F.2d 73 (2d Cir. 1982) ............................................................ 7

*United States v. Matlock*, 415 U.S. 164 (1974) ................................................................... 6

*United States v. Pabon-Cruz*, 391 F.3d 86 (2d Cir. 2004) ................................................. 14

*United States v. Paone*, 782 F.2d 386 (2d Cir. 1986) .......................................................... 6

*United States v. Payton*, 159 F.3d 49 (2d Cir. 1998) ........................................................ 10

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990) ......................................... 13

*United States v. Russo*, 302 F.3d 37 (2d Cir. 2002) ............................................................ 6

*United States v. Sasso*, 59 F.3d 341 (2d Cir. 1995) .............................................. 12, 13-14

*United States v. Scarpa*, 913 F.2d 993 (2d Cir. 1990) ...................................................... 13

Case 1:19-cr-00536-PKC   Document 289   Filed 08/25/23   Page 4 of 19

*United States v. Simmons,* 923 F.2d 934 (2d Cir. 1988) .................................................................. 6

*United States v. Sorrentino*, 72 F.3d 294 (2d Cir. 1995) ............................................................. 7

*United States v. Ulloa*, 942 F. Supp. 2d 202 (D.N.H. 2013) ....................................................... 13

*United States v. Urena, 11 Cr. 1032* (PAE), 2014 WL 1303114 (S.D.N.Y. Apr. 1, 2014) ......... 13

*United States v. Vega*, 589 F.2d 1147 (2d Cir. 1978) ................................................................... 9

**PRELIMINARY STATEMENT**

The Government respectfully seeks rulings *in limine* on certain evidentiary issues in advance of the trial currently scheduled for September 26, 2022. *First*, the Court should admit statements made by co-conspirators in furtherance of the scheme under Rule 801(d)(2)(E). *Second*, evidence of the defendant's history of criminal conduct should be admitted for impeachment purposes, under certain circumstances. *Third*, the Court should preclude cross examination of CW-1 regarding an instance in which CW-1 was involved in domestic violence. *Finally*, the defendant should be precluded from making arguments that are not properly presented to the jury and are simply a guise for jury nullification.

**BACKGROUND**

**A. The Robbery**

Since in or about May 2019, the Drug Enforcement Administration ("DEA"), Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and United States Postal Inspection Service ("USPIS") have been investigating a drug trafficking organization (the "Puerto Rico DTO") that is alleged to have shipped approximately 4,500 kilograms of cocaine from Puerto Rico into the continental United States, including certain addresses in New York, Florida, Connecticut, and Massachusetts, for subsequent distribution. The investigation was initiated following a gunpoint robbery in the Bronx, New York on or about May 29, 2019 targeting more than approximately 150 kilograms of Puerto Rico DTO cocaine (the "Robbery"). Law enforcement responded to the scene of the Robbery and recovered, among other items, two cellphones, broken wooden tables and crates (in which the Puerto Rico DTO cocaine had been concealed and shipped), orange plastic wrapping, shipping labels, and an approximately one-kilogram brick of cocaine. The recovered shipping labels indicated that the packages

concealing the tables that held the Puerto Rico DTO cocaine (the "Bronx DTO Packages") had been shipped from a particular Puerto Rico-based sender (the "Sender").

**B. The Investigation**

In or about early June 2019, law enforcement traced the Puerto Rico-based sender listed on the shipping labels (the "Sender") and identified approximately 70 packages of similar size, weight, and description that had been sent by the Sender from Puerto Rico to the continental United States since in or about October 2018 (the "DTO Packages")—all of which are believed to have contained cocaine.

On or about June 5, 2019, law enforcement learned that three additional packages from the Sender (the "Florida DTO Packages") were out for delivery in Orlando, Florida. Law enforcement called the Florida DTO Packages back to the shipping facility, secured judicially authorized search warrants, and searched one of the Florida DTO Packages. In that first Florida DTO Package, law enforcement recovered a hollowed-out wooden table (of similar appearance to the wooden tables that were found destroyed in the Bronx robbery apartment) that contained approximately 65 kilograms of cocaine. Law enforcement conducted a controlled delivery of the remaining two Florida DTO Packages the following day and arrested the recipient.[1] In total, the three Florida DTO Packages contained approximately 192 kilograms of Puerto Rico DTO cocaine.

During the investigation, law enforcement determined (through, among other connections, cellphone records, IP addresses, email accounts, and money orders paying for the shipment of DTO Packages) that the Sender was a false name that was, in fact, associated with a Puerto Rico

---

[1] The United States Attorney's Office for the Middle District of Florida charged the Florida recipient, Sebastian Denton Zayas, with narcotics conspiracy. *See* 19 Cr. 150 (GAP). Denton Zayas pled to his indictment and was sentenced to 130 months' imprisonment.

2

logistics and shipping company named Back on Track Services and its principals. A superseding indictment on October 22, 2019 charged the Back on Track Services principals and the recipient of the Bronx DTO Packages with narcotics conspiracy. Several further superseding indictments have been filed in this case, bringing Robbery-related charges against two Bronx-based individuals who planned the Robbery, as well as other members of the Puerto Rico DTO.

**C. The Charges**

On July 8, 2021, the defendant was charged in Indictment S9 19 Cr. 536 (the "Indictment") with conspiring to distribute and possess with intent to distribute five kilograms and more of cocaine, in violation of 21 U.S.C. § 846. The defendant was arrested on July 22, 2021 in Massachusetts, presented before this Court, and, following argument, ordered detained. The Government expects that the evidence presented at trial will establish the following facts, in substance and in part:

From at least in or about October 2018 through at least in or about June 2019, Montilla operated as a coordinator of the DTO Packages and was known among certain members of the DTO as "Coche Bomba." In particular, Montilla traveled around the continental United States in a pattern consistent with many of the shipments of the DTO Packages and communicated with (and often traveled with) various named recipients of DTO Packages. In addition, various DTO Packages were sent to addresses associated with Montilla. For example, approximately six DTO Packages that were addressed to a "Juan Carlos Otero" were sent to the Springfield, MA address listed on Montilla's girlfriend's driver's license as her home address.

Law enforcement identified a particular phone number ("Montilla Number-1") that communicated with approximately seven phone numbers that were listed as recipient contact phone numbers on the waybills of DTO Packages that were sent to Florida and Massachusetts in or around the time that DTO Packages were sent and/or delivered. Based on subscriber records,

3

from at least August 2016 until on or about November 23, 2019, the listed subscriber of Montilla Number-1 was "Richard Rivera," which is a variation on Montilla's full name (Abel Ricardo Montilla Rivera), and Montilla's girlfriend was listed as the billing name for Montilla Number-1. On or about November 23, 2019, the listed subscriber and billing name of Montilla Number-1 were changed to "BMWF BMWL," the listed address was changed to a certain address in New Jersey (the "New Jersey Address"), and the contact phone number for the account was changed to (123) 456-7890. Open-source information revealed that the New Jersey Address was the address of a BMW dealership; however, between at least in or about November 2019 and July 2020, call detail records reflect that the calling activity for Montilla Number-1 remained generally consistent with the prior calling activity of Montilla Number-1.

Records, including historical cellsite location records for Montilla Number-1 and airline records, reflect that between at least in or about October 2018 and June 2019, Montilla traveled to locations where DTO Packages were shipped around the dates of DTO Package deliveries. Montilla (using Montilla Number-1) also communicated directly with various DTO Package recipients. Those communications include WhatsApp messages between Montilla and a particular uncharged co-conspirator who received DTO Packages sent to Florida ("CC-1") in furtherance of the narcotics conspiracy; for example:

- On or about January 22, 2019, CC-1 sent Montilla a phone number ending in 6378 (the "6378 Number") and a particular address on Paraiso Drive in Mulberry, FL (the "Paraiso Drive Address").

- On or about January 28, 2019 at approximately 3:09 a.m., two DTO Packages were sent from the Sender to the Paraiso Drive Address; the recipient information listed on the waybills included the 6378 Number.

- On or about January 28, 2019, CC-1 sent Montilla a photograph of a hollowed-out table of the same general appearance as (a) the tables recovered from the scene of the Robbery, and (b) the tables contained within the Florida DTO Packages (which concealed approximately 192 kilograms of cocaine). In CC-1's voice memo message that followed that photograph,

4

- CC-1 stated, in substance and in part, "Otro cliente satisfecho. Tiene casita pa' su perrito ahora y no, no coge frío,[2]" to which Montilla responded with a laughing emoji.

- Between on or about December 26, 2018 and February 6, 2019, approximately 11 DTO Packages were sent to two particular addresses on Maynard Street in Springfield, MA—specifically, to 50 Maynard Street and 52 Maynard Street. All the packages were addressed to a "Rolando Ofarril." In a message on or about February 27, 2019, Montilla sent CC-1 another particular address on the same block of Maynard Street in Springfield, MA—specifically, 56 Maynard Street—which is associated with Montilla in law enforcement databases.

- On or about March 20, 2019, CC-1 again sent Montilla the Paraiso Drive Address, to which Montilla responded, in substance and in part: "Que le de el número de teléfono lo antes posible. Le hace falta el número de teléfono.[3]" On or about March 21, 2019, Montilla wrote to CC-1, in substance and in part: "¿y el número de teléfono pa' cuándo, maricon? Me están tirando. Ya van tres, tres, tres textos que han tirado ya.[4]"

- On or about March 25, 2019, approximately five DTO Packages were sent to the Paraiso Street Address. The named recipient of those DTO Package was the same as the January 2019 Paraiso Street Address DTO Packages, but the recipient information listed a different phone number.

- On or about June 5, 2019 at approximately 12:46 p.m., Montilla wrote to CC-1, in substance and in part: "Ya estoy serca hablando con enterprise.[5]" Historical cellsite records reflect that Montilla as in the vicinity of Orlando, FL at the time of that message. As described herein, the Florida DTO Packages (*i.e.*, the packages that were seized and found to contain approximately 192 kilograms of cocaine) were out for delivery in Orlando, FL on June 5, 2019.

## ARGUMENT

### I. The Court Should Admit Montilla's Own Statements and Co-Conspirator Statements

#### A. Applicable Law

The Federal Rules of Evidence define "hearsay" as an out-of-court statement "offer[ed] in

---

[2] The message translates into English as: "Another satisfied customer. He has a little house for the puppy now and he doesn't get cold."

[3] The message translates into English as: "To give him the phone number as soon as possible. He is missing the phone number."

[4] This message translates into English as: "What about the phone number, dude? They're calling me. They already sent me three, three, three texts"

[5] This message translates into English as: "I am close, speaking to Enterprise."

evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part, "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's coconspirator during and in furtherance of the conspiracy." A Court must find two facts by a preponderance of the evidence to admit a statement pursuant to this rule: *first*, that a conspiracy that included the declarant and the defendant existed; and *second*, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

Once a conspiracy is shown to exist, the "evidence sufficient to link another defendant to it need not be overwhelming," and "the 'in furtherance' requirement of Rule 801(d)(2)(E) is satisfied" when, for example, "a co-conspirator is apprised of the progress of the conspiracy, or when the statements are designed to induce his assistance." *United States v. Paone*, 782 F.2d 386, 390-91 (2d Cir. 1986) (internal quotation marks omitted). Statements between co-conspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," further the conspiracy. *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1988).

When offered by the Government, statements of a defendant are not within the definition of hearsay, *see* Fed. R. Evid. 801(d)(2)(A), and hence are not excludable as hearsay regardless of whether they would fall under another exclusion from the hearsay definition or under an exception to the hearsay rule. *See United States v. Matlock*, 415 U.S. 164, 172 n.8 (1974). "Statements made by the defendant," where relevant, "may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party." *United States v. Russo*, 302 F.3d 37, 43 (2d Cir. 2002) (admitting defendant's recorded prison calls as party opponent admissions); *accord United States v. Keats*, 937 F.2d 58, 63 (2d Cir. 1991).

Generally, under Rule 801(d)(2)(A), the defendant's statements can be offered for their truth, while the statements of others can be admitted to provide necessary context to the defendant's statements. *See United States v. Dupre*, 462 F.3d at 137 (e-mail messages properly admitted not for truth of matters asserted, but rather to provide context for defendant's messages sent in response); *United States v. Sorrentino*, 72 F.3d 294, 298 (2d Cir. 1995) (recorded statements of a confidential informant were properly admitted as non-hearsay to render intelligible defendant's recorded, responsive statements), abrogated on other grounds by *United States v. Abad*, 514 F.3d 271 (2d Cir. 2008).

### B. Discussion

As described above, Montilla conspired with others, including CC-1, to commit the charged narcotics offense. Among other things, Montilla and CC-1 communicated by phone, over end-to-end encrypted WhatsApp messages, exchanging identifying information (including names, addresses, and phone numbers) for DTO Package recipients and apparent messages regarding the status of DTO Package shipments and deliveries.

Montilla's statements in the text messages with CC-1 are admissible under Federal Rule of Evidence 801(d)(2)(A) as admissions of a party opponent and therefore are not excludable as hearsay. *See United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("[U]nder Rule 801(d)(2)(A)," a defendant's statement offered by the Government "is not hearsay, because it is simply a statement of the opposing party."). The statements are clearly relevant because they are direct evidence of the charged offense. CC-1 sent Montilla photographs of the furniture used to transport cocaine, used coded language to refer to the cocaine, and corresponded about the recipient addresses. Montilla pressed CC-1 for a phone number for a DTO Package recipient and indicated that other co-conspirators were pressuring Montilla to provide the phone number. The circumstances of these messages make clear that Montilla was in a conspiracy with CC-1. All statements made by

CC-1 in furtherance of that narcotics conspiracy, such as the statements discussed *supra* at 4-5, therefore are admissible as direct evidence against Montilla under Rule 801(d)(2)(E).

For the foregoing reasons, Montilla's and CC-1's statements are properly admitted as admissions of a party opponent under Federal Rule of Evidence 801(d)(2)(A).

In addition, at trial, the Government anticipates that two cooperating witnesses ("CW-1" and "CW-2," together, the "CWs") will testify. The CWs played various roles in the DTO and facilitated the shipment of cocaine from Puerto Rico to the continental United States. The CWs will describe that they were aware of a continental U.S.-based DTO member that the CWs referred to as "Coche Bomba"—*i.e.*, the defendant

Both of the CWs are expected to testify about a phone conversation among CW-1, CW-2, another co-conspirator ("CC-2"), and "Coche Bomba" regarding an issue with the delivery of certain of the DTO Packages; specifically, that CW-1, CW-2 and CC-2 (in Puerto Rico) called "Coche Bomba" (*i.e.*, Montilla) about a delayed DTO Package shipment, because "Coche Bomba" was involved with the delivery. This conversation about the DTO Packages is in furtherance of the charged conspiracy, and the participants in the conversation are all coconspirators. Accordingly, it is not hearsay and may be admitted as substantive evidence. *See* Fed. R. Evid. 801(d)(1)(E).

CW-2 is further expected to testify that at some point during their involvement in the DTO, prior to the June 2019 seizure of DTO Packages in Florida, CW-1 told CW-2, in substance and in part, that "Coche Bomba's" true name was "Abel Montilla" and that "Coche Bomba" lived in, or was associated with, Massachusetts.[6] This statement was made during a broader conversation

---

[6] CW-1 does not recall this conversation and does not presently remember "Coche Bomba's" true name.

between CW-1 and CW-2 about the organization of the DTO and personnel involved in facilitating the DTO's narcotics shipments. Thus, it was a conversation between coconspirators in furtherance of the charged conspiracy and is admissible as substantive evidence at trial. *See* Fed. R. Evid. 801(d)(1)(E).

For the foregoing reasons, the Government should be permitted to offer evidence concerning out of court statements made by (i) Montilla and CC-1; (ii) Montilla, CW-1, and CW-2; and (iii) CW-1 and CW-2.

**II. Evidence Concerning Montilla's Prior Narcotics Conviction Should Be Admitted If He Testifies**

**A. Applicable Law**

A testifying defendant "has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts." *Brown v. United States*, 356 U.S. 148, 155 (1958) (quotation omitted); *see also United States v. Havens*, 446 U.S. 620, 627 (1980) (essential to permit Government to pose "proper and effective cross-examination"); *United States v. DiLapi*, 651 F.2d 140, 151 (2d Cir. 1981) (Mishler, J., concurring) ("basic fairness" requires that "story presented on direct [by defendant] is measured for its accuracy and completeness by uninfluenced testimony on cross-examination"); *United States v. Vega*, 589 F.2d 1147, 1151 n.3 (2d Cir. 1978) (defendant should not be allowed to "frustrate the truth-seeking function of trial by presenting tailored defenses insulated from effective challenge"). Thus, cross-examination of a defendant appropriately encompasses "*all* non-collateral matters." *See United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir. 1985) (emphasis added).

Rule 608(b) permits cross-examination of specific instances of conduct of a principal witness if "probative of the character for truthfulness or untruthfulness" of the witness. Fed. R. Evid. 608(b). In deciding the extent of proper impeachment material under Rule 608(b), courts

generally apply the balancing considerations of Federal Rule of Evidence 403. *See Hynes v. Coughlin*, 79 F.3d 285, 294 (2d Cir. 1996); Fed. R. Evid 608 (b)(2) advisory committee note (1972); *United States v. Huddleston*, 485 U.S. 681, 685 (1988).

The scope of cross examination allowed the Government in cross examining a defendant is significantly broader when the Government seeks not just to attack the defendant's credibility in a general fashion, but to engage in impeachment by contradiction or "impeachment of specific falsehoods." *United States v. Beverly*, 5 F.3d 633, 639 (2d Cir. 1993). In such a situation, the restrictions of Rule 608(b) no longer apply. *See id.* "Where a defendant testifies on direct about a specific fact, the prosecution is entitled to prove . . . that he lied as to that fact." *Id.* (citing *United States v. Garcia*, 936 F.2d 648, 653 (2d Cir. 1991)); *see also United States v. Payton*, 159 F.3d 49, 58 (2d Cir. 1998); *United States v. Gambino*, 951 F.2d 498, 503-04 (2d Cir. 1991); *United States v. Garcia*, 936 F.2d 648, 653-54 (2d Cir. 1991). "The same holds true for defendant's false statements on cross-examination." *Beverly*, 5 F.3d at 639-40.

The Government is also entitled to use a defendant's prior conviction to impeach him during cross-examination, pursuant to Federal Rule of Evidence 609. *See Estrada*, 430 F.3d at 617 ("Rule 609(a)(1) presumes that all felonies are at least somewhat probative of a witness's propensity to testify truthfully."); *United States v. Hayes,* 553 F.2d 824, 828 (2d Cir. 1977) (prior conviction for importation of cocaine probative on the issue of accused's veracity and was properly admitted under Rule 609(a)(1)).

With respect to a conviction older than ten years (or a conviction that did not result in confinement within the past ten years), it is admissible only if: "(1) its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and (2) the

10

proponent gives an adverse party written notice of the intent to use it so that the party has a fair opportunity to contest its use." Fed. R. Evid. 609(b).

Impeachment evidence involving a defendant's prior criminal convictions must also satisfy Rule 403, which provides that a court may exclude evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. In balancing probative value against prejudicial effect under this rule, courts examine the following factors: (1) the impeachment value of the prior crime, (2) the remoteness of the prior conviction, (3) the similarity between the past crime and the conduct at issue, and (4) the importance of the credibility of the witness. *See* 4 *Weinstein's Federal Evidence* § 609.04[2][a], at 609–20 (1997); *Hayes*, 553 F.2d at 828.

**B. Discussion**

Montilla was convicted in July 2010[7] under the name "Abel Montilla," a/k/a "Ralph Montilla" in Superior Court of New Jersey, Atlantic County, for manufacture or distribution of a controlled dangerous substance with intent to distribute in the third degree, in violation of New Jersey Statutes Annotated Section 2C:35-5. If Montilla testifies on his own behalf, the Government should be permitted to use the defendant's prior conviction to impeach him during cross-examination, pursuant to Federal Rule of Evidence 609(a)(1). *See United States v. Estrada*, 430 F.3d 606, 617 (2d Cir. 2005) ("Rule 609(a)(1) presumes that all felonies are at least somewhat probative of a witness's propensity to testify truthfully."); *Hayes,* 553 F.2d at 828 (prior

---

[7] The charges related to a July 20, 1993 arrest in Atlantic City, NJ. Montilla was arrested in Springfield, MA in or about June 2010 on a bench warrant.

11

conviction for importation of cocaine probative on the issue of accused's veracity and was properly admitted under Rule 609(a)(1)).

### III. The Court Should Impose Reasonable Limits on Cross-Examination of CW-1

The Court should preclude the defendant from cross examining CW-1 about the following topic: CW-1 told the Government that, approximately 20 years ago, CW-1 had a domestic violence incident involving CW-1's then-significant other. According to CW-1, an argument turned into a physical struggle, at which point someone called the police. The significant other did not suffer any physical injuries and no formal charges were filed.

#### A. Applicable Law

The Federal Rules of Evidence limit the circumstances under which evidence of specific acts of a witness may be introduced into evidence. Rule 608(b) provides that "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." The Court "may, on cross-examination, allow [those prior acts] to be inquired into," but only if such acts "are probative of the character for truthfulness or untruthfulness of . . . the witness." Fed. R. Evid. 608(b)(1). Any such cross-examination also must satisfy Rule 403—that is, specific instances of a witness's prior conduct may be inquired into on cross-examination only if the probative value of such evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* Fed. R. Evid. 403; *United States v. Sasso*, 59 F.3d 341, 347-48 (2d Cir. 1995). In this context, evidence is unfairly prejudicial if it would invite the jury to decide an issue material to the outcome of the case for reasons that have nothing to do with the factual issues properly before the jury. *See United States v. Harvey*, 991 F.2d 981, 996 (2d Cir. 1993).

Furthermore, Rule 611 provides that "[c]ross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility," and that the Court should "avoid wasting time" and "protect witnesses from harassment or undue embarrassment." It is well settled that "[t]he scope and extent of cross-examination lies within the discretion of the trial judge." *United States v. Scarpa*, 913 F.2d 993, 1018 (2d Cir. 1990) (internal quotation marks omitted). As the Supreme Court has explained:

> [T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination [of a prosecution witness] based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

*Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) (internal quotation marks omitted). "As long as a defendant's right to confront the witnesses against him is not violated, limitations on cross-examination are not grounds for reversal," *United States v. Roldan-Zapata*, 916 F.2d 795, 806 (2d Cir. 1990), and "[t]he decision of the trial court to restrict cross-examination will not be reversed on appeal unless its broad discretion has been abused," *United States v. Maldonado-Rivera*, 922 F.2d 934, 956 (2d Cir. 1990). "A trial judge does not abuse his discretion by curtailing cross-examination as long as the jury has 'sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government.'" *Scarpa*, 913 F.2d at 1018 (quoting *United States v. Singh*, 628 F.2d 758, 763 (2d Cir. 1980)).

**B. Discussion**

None of the above subjects have any bearing on CW-1's character for truthfulness, and are entirely unrelated to the instant case. *See, e.g.*, *United States v. Ulloa*, 942 F. Supp. 2d 202, 207 (D.N.H. 2013) ("instance of marital infidelity, standing alone, has no value in evaluating

13

[witness's] character for truthfulness or untruthfulness"); *United States v. Urena*, 11 Cr. 1032 (PAE), 2014 WL 1303114, at *3 (S.D.N.Y. Apr. 1, 2014) (precluding defense from questioning witness about "domestic violence incident" where defense "does not explain how this incident is in any way probative of [witness's] character for truthfulness or untruthfulness"); *Sasso*, 59 F.3d at 347 (affirming district court's decision to preclude cross-examination on witness's "not-unpredictable depression," even where "depression was relatively recent," because, among other reasons, "there was no indication that [her condition] affected her ability to perceive events or to understand what was said to her" during the events in question). Accordingly, the defendant should be precluded from cross-examining CW-1 concerning the above topics.

### IV. Evidence or Argument Concerning the Consequences the Defendant Faces if Convicted Should be Precluded

The defendant should be precluded from presenting evidence or arguments regarding the penalties associated with the offense with which he is charged. The Supreme Court has held that, as a general rule, juries should not consider the sentencing consequences of their verdicts. *See Shannon v. United States*, 512 U.S. 573, 579 (1994) ("Information regarding the consequences of a verdict is . . . irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their fact-finding responsibilities, and creates a strong possibility of confusion."). The potential penalties faced by the defendant are irrelevant except as improper arguments in favor of nullification. *See United States v. Pabon-Cruz*, 391 F.3d 86, 94 (2d Cir. 2004) ("[I]nasmuch as no juror has a right to engage in nullification . . . trial courts have the duty to forestall or prevent such conduct . . . ." (quotation omitted)). Accordingly, the defendant should be precluded from putting this issue before the jury.

## **CONCLUSION**

For the foregoing reasons, the Government's motions *in limine* should be granted.

Dated: New York, New York
August 24, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/
Juliana N. Murray
Ryan B. Finkel

Assistant United States Attorneys
(212) 637-2314 / 6612